Yeates J.
* in summing up the evidence to the jury, observed, that it was incumbent on the plaintiff to make out a good title before he could recover the lands in question, and that the real gist of the controversy lay in a proper eompari-ison of the rights of Blaine and Ross, previous to either of the patents being issued. He premised, that
Applications in the land office after the opening of it on the 3d April 1769, are the inceptions of titles when duly pursued. Merely of itself such a location • creates no right. No part of the purchase money is paid. It is the bare expression of a. wish to hold certain lands, on which 7s. 6d. only is paid for the office fees of entering it. No title vests thereby, nor does it form any contract, on which the party could be sued by the proprietaries formerly, or by the state now, until a survey has been made, designating the party’s pretensions by metes and bounds. When such a location is followed up with proper diligence, it will give a right of pre-emption to the lands described therein; but any location may, like the imperfect title of improvement, (Vide act passed 5th April 1782, § 2,) be forfeited by abandonment or dereliction. When there has been negligence in obtaining a survey, a subsequent location may, by due industry, defeat its operation, as to lands which it might be supposed to describe with sufficient accuracy and certainty.
If these general rules are correct, as it is presumed they are, the application of them to the case before us, is familiar and easy. The plaintiff’s location does not precisely describe these lands. It calls for the land in the bend of the river. That of the defendant’s is more close and descriptive. The plaintiff has been guilty of gross laches and neglect in laying *289 by for fourteen years without getting a survey made, or making any pretensions to the lands, during which period they have been rendered much more valuable, by the labours of the occupier. Ross gets a survey returned, which appears however to have been made in 1769, for James M’Kee, and paid for by his agent. If the plaintiff has suffered a survey *2901 ma<^e> though he might originally have * included J the lands in question, and not entered his caveat in due time, or made his objections thereto, he shall be postponed. Such is the practice of all courts and juries, and of the land office, and ought to be so on general principles of convenience to the community. For no one should be permitted under a general, though early application, to thumb the face of a whole country, and retard its settlement and cultivation by his own negligence.
The question then, if determined on the relative merits of the titles of Blaine and Ross, immediately before the latter joined the common enemy, will admit of an easy solution. The maxim ‘ ‘ vigilantibus non dormientibus leges subser-viunt,” applies with peculiar force in the case of rights founded on locations. I throw out of view the permission of captain Edmonstone, as it does not appear that a settlement attended it, but an adverse possession has been shewn in evidence.
The judgment of the Board of Property cannot alter the nature of the title. What grounds they proceeded on, we know not. But this we know, that the parties interested have a legal right to contest their decision in a court of law, by the express words of the act of assembly of 5th April 1782. No caveat, or judgment of the Board of Property is produced on the part of the plaintiff. It does not appear that any notice, previous to the hearing, was given to the attorney general, the agents of forfeited estates, or to any executive officer whatever. We must therefore conclude it to be ex parte; nor can I bring myself to believe, if the Board of Property knew as much of the case as we are now possessed of, they would have given such a judgment. Be this as it may, we must now form a judgment for ourselves, on the whole of the facts given to us in evidence.
By the attainder of Alexander Ross for high treason, his whole estate, real and personal, became vested in the commonwealth, under the 5th section of the act of assembly of 6th March 1778. And under this law, and the supplement thereto, passed 29th March 1779, the agents of forfeited estates were directed to sell the estates of traitors in a certain mode prescribed. The same laws which vested the property in the state, qualified the sale of it by the instrumentality of certain persons authorised for that peculiar purpose. And such a restriction was highly necessary for the general benefit. Otherwise, highly improved lands, lying perhaps in the vi *290 cinity of the metropolis, or in the heart of the state, forfeited by the attainder of persons who had joined the enemy, might be disposed of on the common terms of vacant and unappropriated lands; which never could have *been the will of the people. These acts are certainly more than directory, they are restrictive.
Cited in 7 S. & R., 304, in support of the proposition that lands which have been granted by the state, and which escheat and fall back to the state for want of heirs, alienage, or forfeiture for treason, or any other cause, are not open to settlement or grant, as the common unappropriated land of the state. Cited for the same purpose in 27 Pa., 38; 77 Pa., 221.
Cited in 26 Pa., 421, on the question of usage of the land office.
It appears to me therefore, that it is an insuperable bar to the plaintiff’s recovery, that he does not deduce his title through the proper and legal conduit of sale and conveyance, supposing the adverse legal title of Ross to be preferable. The agents of forfeited estates sold these lands on the 12th March 1784, and then received the money of the purchaser. It is not possible to conceive that the commonwealth, above nine months afterwards, could convey a legal right to the lessor of the plaintiff, after they had parted with their title, through the medium of the agents of forfeited estates. They could not grant what they had not; and neither the state nor an individual can do an act and produce an effect morally impossible in Itself.
My opinion, on the whole, is decidedly with the defendants ; and I have the satisfaction of declaring, that the Chief Justice concurs with me in opinion.
The plaintiff suffered a nonsuit, without permitting the jury to leave the bar.

 M’Keati C. J. attended the trial in the forenoon, hut was confined by indisposition to his chamber, after the adjournment of the court.